IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:19-CR-323-FL-1

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | |
| | ) | ORDER |
| DARREL DEMETRIUS WHITEHEAD, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the court on defendant's motion to suppress certain evidence allegedly obtained in violation of the Fourth Amendment to the United States Constitution. (DE 23). Pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Criminal Procedure 59(b), United States Magistrate Judge Kimberly A. Swank entered memorandum and recommendation ("M&R"), wherein it is recommended that defendant's motion be denied. (DE 36). Defendant timely objected to the M&R. In this posture, the issues raised are ripe for ruling. For the following reasons, defendant's motion is denied.

### STATEMENT OF THE CASE

Indictment filed August 14, 2019, charges defendant with felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924. Defendant filed the instant motion February 18, 2020, seeking suppression and exclusion of all evidence obtained April 13, 2019, during a warrantless seizure and subsequent frisk of his person, allegedly in violation of the Fourth Amendment to the United States Constitution. In support of the motion, defendant relies upon an image produced by Google Maps.

The government responded in opposition to the instant motion on March 20, 2020. After briefing completed, the court held hearing on the motion to suppress on June 11, 2020, during which the court heard testimony of Corporal Jonathan Denotter ("Corporal Denotter"), Officer Victoria Chinn, Corporal Eric Rauen, and Detective Clay Joyner, all of the Rocky Mount Police Department, and Investigator Ken Hall of the Federal Public Defender's Office. The court also admitted documentary and video evidence.

On September 25, 2020, the magistrate judge entered M&R recommending that the instant motion be denied. Defendant filed objections on December 7, 2020.

## STATEMENT OF FACTS

The court incorporates herein for ease of reference the facts set forth in the M&R.

> On Friday, April 13, 2019, Rocky Mount Police Department Corporal Jonathan Denotter was patrolling the Happy Hill area of Rocky Mount, North Carolina in his marked police vehicle. After midnight, while parked at the Piggly Wiggly grocery store with the windows rolled down, Denotter heard four or five gunshots. Based on the volume and direction of the sound, Denotter estimated the shots came from the area of Beal Street. He called dispatch on his police radio at 12:25 a.m. to report the gunshots and to advise that he was en route to Beal Street. Denotter then drove approximately three blocks to the intersection of North Tillery and Beal Streets. Denotter looked down Tillery Street and saw a pedestrian (later identified as Whitehead) two blocks (approximately .15 miles) away, at the intersection of South Tillery Street and Western Avenue. He watched Whitehead cross the intersection to Western Avenue. Having seen no other individuals or vehicles in the area, Denotter drove to Western Avenue to speak to Whitehead. Denotter exited his vehicle, activated his body camera, shined his flashlight on Whitehead, and called out, "Let me speak with you a moment." Whitehead said something Denotter could not make out but did not stop. Denotter asked, "What's that?" then stated, "I said let me speak with you a moment." When Whitehead asked why, Denotter responded, "Because I told you to." Whitehead continued walking, at which point Denotter told Whitehead, "Hey look, you need to stop where you're walking; I'm giving you an order now. Keep your hands out of your pocket where I can see them." Whitehead then turned toward Denotter and raised his arms to the side.
>
> As Denotter approached Whitehead, he heard four or five more gunshots coming from behind him. He told Whitehead, "That's the reason I'm stopping you right there — gunshots." Denotter continued, "You got anything on you, man? I just want to pat you down real quick. You good with that?" Whitehead replied, "I

2

was just walking, sir." After speaking briefly with dispatch about the additional gunshots, Denotter instructed Whitehead to turn around so that he could pat him down for weapons. Whitehead turned around as instructed and began to lower his arms, at which point Denotter instructed him to keep his hands up. Whitehead asked why Denotter was patting him down, to which Denotter responded, "I'm patting you down to make sure you don't got no weapons on you. You understand that, right?"

Corporal Rauen was approximately four or five minutes away and responded to Denotter's call about gunshots, possibly in the Beal Street apartments. While en route, Denotter asked someone to check Western Avenue. Rauen was familiar with a gang house on Western, so he responded to Western Avenue. He drove slowly with his window down so he would be able to hear what was happening around him. He did not see or hear anyone else walking or driving in the area. Rauen arrived from the opposite end of Western Avenue as Denotter, and he observed Denotter's interaction with Whitehead.

Corporal Rauen exited his vehicle and approached as Denotter was beginning to frisk Whitehead. He saw that Whitehead kept lowering his arms toward his waistband and front pocket, so he took control of Whitehead's right hand. Denotter then began the frisk by checking the front pocket of the hooded pullover. Denotter immediately felt what appeared to be the pistol grip of a handgun. He advised Rauen of the weapon and placed Whitehead in handcuffs. Rauen then removed a Smith and Wesson 9 mm handgun from the pocket of Whitehead's hooded pullover. There was one Federal brand cartridge in the chamber and three Winchester rounds in the magazine. Two additional rounds were recovered from Whitehead's left pants pocket.

Officer Chinn arrived on the scene after Whitehead had been taken into custody. She had just cleared a call in the area and was nearby. In the one to two minutes it took her to get there, she saw no pedestrians or vehicles in the area. She had seen Whitehead walking around the Happy Hill area earlier in the evening. After speaking with Denotter, Chinn searched the area and found four 9 mm shell casings (two Winchester brand and two Federal brand) near the intersection of North Tillery and Beal Streets.

(M&R (DE 36) at 2-5).

## COURT'S DISCUSSION

A.    Standard of Review

The district court reviews de novo those portions of a magistrate judge's M&R to which specific objections are filed. 28 U.S.C. § 636(b). The court does not perform a de novo review where a party makes only "general and conclusory objections that do not direct the court to a

3

specific error in the magistrate's proposed findings and recommendations." Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982). Absent a specific and timely filed objection, the court reviews only for "clear error," and need not give any explanation for adopting the M&R. Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir. 1983). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

B.  Analysis

Defendant objects to the magistrate judge's finding that reasonable suspicion supported the seizure that occurred on April 13, 2019.

The Fourth Amendment to the United States Constitution secures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The protection against unreasonable seizures includes "brief investigatory stops, also known as Terry stops." United States v. Kehoe, 893 F.3d 232, 237 (4th Cir. 2018) (citing Terry v. Ohio, 392 U.S. 1 (1968)). In assessing the constitutionality of Terry stops, courts consider whether the government agent's "action is supported by a reasonable and articulable suspicion that criminal activity 'may be afoot.'" United States v. Foster, 824 F.3d 84, 88 (4th Cir. 2016) (quoting Terry, 392 U.S. at 30) ("Foster II").[1]

"Reasonable suspicion requires 'more than an inchoate and unparticularized suspicion or hunch'; rather, the government agent must articulate a particularized, objective basis for his or her actions." Kehoe, 893 F.3d at 237 (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)). As such, the government agent "must be able to point to specific and articulable facts which, taken

---

[1] The court adopts this shorthand to distinguish Foster II from United States v. Foster, 634 F.3d 243, 249 (4th Cir. 2011), which is also cited herein.

4

together with rational inferences from those facts, reasonably warrant that intrusion." United States v. Black, 707 F.3d 531, 539 (4th Cir. 2013) (citing Terry, 392 U.S. at 21). To determine if a government agent had reasonable suspicion, "courts look to the totality of the circumstances." Foster II, 824 F.3d at 89 (internal quotations and citations omitted).

Here, defendant objects to the finding in the M&R that reasonable suspicion supported Corporal Denotter's seizure of defendant. There is, however, ample evidence in the record reasonably to draw this conclusion. First, the seizure occurred after midnight in a high crime area. (Transcript of Hr'g ("Tr.") 6:15-24; 8:4-5). "While the defendant's mere presence in a high crime area is not by itself enough to raise reasonable suspicion, an area's propensity toward criminal activity is something that an officer may consider." United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993) (citations omitted). Likewise, "the lateness of the hour is another fact that may raise the level of suspicion." Id. (citations omitted).

Additionally, defendant was the only person in the vicinity of the area where Corporal Denotter heard four or five gunshots, and there were no vehicles driving in the area. (Tr. 18:8-25). This fact reasonably contributed to Corporal Denotter's suspicion that defendant fired the shots. See Foster II, 824 F.3d at 94–95 ("Burke and Boyer were investigating a reported gunshot, in a high-crime area, at night. Because Foster was the only person in the area where the gunshot was reported, the police justifiably had some suspicion that he might have been the individual who fired the shot.") (emphasis in original); United States v. Moore, 817 F.2d 1105, 1107 (4th Cir. 1987) ("The call came late at night, and appellant was the only person in the vicinity. Moreover, appellant was moving away from the scene of the crime . . . These circumstances in combination support a reasonable suspicion that appellant was involved in the break-in.").

Finally, defendant exhibited evasive behavior upon seeing Corporal Denotter, who was in a marked police vehicle, (Tr. 19:1-14), which also reasonably raised Corporal Denotter's

suspicion.  See Lender, 985 F.2d at 154.  ("Evasive conduct, although stopping short of headlong flight, may inform an officer's appraisal of a streetcorner encounter.") (citing United States v. Sharpe, 470 U.S. 675, 683 n. 3 (1985)).  In assessing defendant's behavior, Corporal Denotter was entitled to draw on his 13 years of law enforcement experience, (Tr. 3:16-18), "to make inferences from and deductions about the cumulative information available to [him] that 'might well elude an untrained person.'"  United States v. Hernandez-Mendez, 626 F.3d 203, 208 (4th Cir. 2010) (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)).  Considering the totality of the circumstances, reasonable suspicion supported Corporal Denotter's seizure of defendant.

Defendant argues, however, that his behavior was not evasive or suspicious.  Regarding defendant's "suspicious" behavior, Corporal Denotter testified:

> When I first noticed [defendant] at Tilley and Beal, I noticed that as I came to the intersection—it is a well-lit area, with streetlights, LED streetlights—I noticed that the subject appeared like he was peering back my way and made an abrupt turn back down Western and–east, and so that kind of struck me as being very suspicious behavior . . . Through my experience –my law enforcement experience, I usually – when somebody sees the police and they make an abrupt movement or something like that, it appears to be that most of the time they have something to hide or try to deflect their attention–my attention away from them.
>
> . . .
>
> Well, on my initial approach when I got out of the vehicle and asked him could I speak with him, as you see in the video, it appeared that he wasn't concerned with me or what I had to say.  He kept turning, placing his body away from me as if he was trying to hide something.

 (Tr. 19:3-14; 24:15-19).

To challenge Corporal Denotter's assessment, defendant first argues it was too dark outside for Corporal Denotter to accurately observe him.  However, as Corporal Denotter testified, defendant was in a "well-lit area, with streetlights, LED streetlights", so darkness did not obscure Corporal Denotter's vision.  Next, defendant takes issue with Corporal Denotter's use of the word "abrupt."  According to defendant, "the dictionary defines the adjective 'abrupt' as 'characterized

6

by or involving action or change without preparation or warning: sudden and unexpected'" and "[b]ased on this definition, it is difficult to imagine any transition from standing stationary to walking not being abrupt, unless the individual at issue were to give prior warning of his forthcoming decision to go from standing to walking." (Def. Obj. (DE 44) at 7) (citing Merriam-Webster, abrupt, available at http://marriam-webstar.com/dictionary/abrupt (last accessed Dec. 5, 2020).

Defendant's wordsmithing is unpersuasive. Regardless of the precise descriptor used, defendant's conduct upon seeing Corporal Denotter's marked police car resembled conduct deemed suspicious in other cases. See Lender, 985 F.2d at 154 ("The defendant's conduct after the officers left their car but before Officer Hill called 'Stop' did nothing to allay the officers' earlier suspicions. When the officers tried to approach Lender, he attempted to evade them by turning his back and walking away."); United States v. Sims, 296 F.3d 284, 287 (4th Cir. 2002) ("[W]hen Officer England reached the vacant lot, he found Sims behind a house, 'crouching' and 'peeking around the corner' at him. As soon as England made eye contact, Sims 'jerk[ed] right back' out of view. An officer is entitled to consider the kind of 'evasive' behavior in which Sims engaged."); United States v. Humphries, 372 F.3d 653, 660 (4th Cir. 2004) ("Humphries immediately walked away as the officers approached, and although he did not run, he walked away at a quick pace, ignoring the officer's commands to stop . . . Such evasive conduct would suggest culpability to a reasonable officer.").

Next, defendant contends his behavior could not have been very suspicious since Corporal Denotter contemplated letting defendant go. At hearing, counsel for the government asked Corporal Denotter, "You said that you thought about letting him go, but it was too obvious?" (Tr. 61:18-19). To which Corporal Denotter replied, "Too obvious that the shots being fired and him being in the general vicinity." (Tr. 61:20-21). Implicit in this statement is the fact that defendant

7

was the only person in the vicinity of the gunshots, rendering it more probable that defendant fired the shots.  Moreover, Corporal Denotter's candid statements regarding his thought process reveal that he carefully considered whether to conduct a seizure on defendant, which reinforces, rather than undercuts, the reasonableness of his ultimate decision.

Defendant also argues that Corporal Denotter "engage[d] in a 'post hoc rationalization' of his decision to stop Mr. Whitehead since that particular seizure just so 'happened to turn up contraband'" which "the Fourth Circuit forbade in Foster." (Def. Obj. (DE 44) at 8) (quoting United States v. Foster, 634 F.3d 243, 249 (4th Cir. 2011) ("Foster I").  Yet, the facts and circumstances that informed Corporal Denotter's reasonable suspicion differ markedly from the facts in Foster I.  Here, the seizure occurred in a high crime area late at night, rather than in a restaurant parking lot in the middle of the day, as was the case in Foster I. 634 F.3d at 245. Moreover, in the instant case, Corporal Denotter heard gun shots, reasonably alerting him to the presence of crime, a factor that was absent in Foster I.  Finally, here defendant engaged in evasive behavior upon seeing Corporal Denotter's marked vehicle, whereas the defendant in Foster I "did not flee, and remained in the parked vehicle for at least fifteen minutes" after seeing the detective. Id. at 248.  Given these distinctions, the court cannot conclude that Corporal Denotter's conclusions were post hoc rationalizations.

Finally, defendant argues Corporal Denotter lacked reasonable suspicion, relying upon United States v. Curry, No. 3:17-CR-130, 2018 WL 1384298 (E.D. Va. Mar. 19, 2018).  In Curry, police officers were patrolling a high crime area late at night when they heard five or six gunshots. 2018 WL 1384298, at *13. The officers traveled to where they thought the gunshots originated and found five to eight men in a field adjacent to an apartment complex.  Id.  The officers spoke with each man and searched at least two of them, including the defendant.  Id.  At the suppression hearing, when asked why he approached the defendant, the officer stated "it wasn't just [defendant]

8

I was looking for. I was looking at everyone's hands." Id. at *11. Accordingly, the district court found that the officer lacked particularized, reasonable suspicion as to the defendant. Id.

While similar to Curry in some regards, the instant matter differs in two key aspects. First, here, defendant was the only person found within the vicinity of the gunshots, increasing the likelihood that he fired the shots. Second, defendant demonstrated evasive behavior upon seeing Corporal Denotter's marked car, whereas "Curry made no furtive gestures, and did not walk at an accelerated pace indicative of flight." Id. at*3. These distinctions provided Corporal Denotter with the particularized suspicion that was absent in Curry.[2]

Taking into account the totality of the circumstances, Corporal Denotter had reasonable suspicion that defendant was engaged in criminal activity. Therefore, defendant's objections must be overruled, and defendant's motion to suppress must be denied.

## CONCLUSION

Based on the foregoing, the court ADOPTS the recommendation of the M&R (DE 36) and DENIES defendant's motion to suppress. (DE 23).

SO ORDERED, this the 2nd day of February, 2021.

LOUISE W. FLANAGAN
United States District Judge

---

[2] Defendant also relies upon the Fourth Circuit's proclamation that "[a]llowing officers to bypass the individualized suspicion requirement based on the [ ]—the sound of gunfire and the general location where it may have originated—would completely cripple a fundamental Fourth Amendment protection and create a dangerous precedent." United States v. Curry, 965 F.3d 313, 315 (4th Cir. 2020). As stated above, however, Corporal Denotter did not bypass individualized suspicion requirement—he had a particularized basis to believe that defendant was engaged in criminal activity. Moreover, in Curry, the government did not challenge the district court's finding that the officer lacked reasonable suspicion; therefore, on appeal, the Fourth Circuit only addressed whether the seizure was lawful under the exigent circumstances exception. Curry, 965 F.3d at 318. Here, the government is not relying on the exigent circumstances exception, rendering the Fourth Circuit's opinion in Curry of limited import.

9